IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ALEXANDER CHI, | ) |  |
|---|---|---|
| Plaintiff, | ) ) |  |
| vs. | ) ) | Case No. 10 C 6292 |
| LOYOLA UNIVERSITY MEDICAL CENTER and SUNEEL NAGDA, | ) ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Dr. Alexander Chi has sued Loyola University Medical Center (Loyola) and Dr. Suneel Nagda for defamation, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. The Court has jurisdiction based on diversity of citizenship. The Court previously dismissed Dr. Chi's tortious interference and emotional distress claims, leaving only Dr. Chi's defamation claim against defendants. *Dr. Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797 (N.D. Ill. 2011). The Court assumes familiarity with that decision.

Defendants have moved for summary judgment. For the reasons stated below, the Court grants defendants' motion.

### Background

Dr. Chi worked for Loyola as a medical resident in its radiation oncology program from July 2005 through September 2009. From July 2008 through March 2012, Dr. Nagda served as the program director of the radiation oncology residency program at

Loyola.

Dr. Chi contends that throughout his residency, Dr. Nagda and other Loyola staff treated him unfairly. Specifically, Dr. Chi states in his affidavit that "[f]rom the beginning of my residency at Loyola, I was subjected to false statements concerning my conduct from other residents, chief residents, program directors, attending physicians, and staff." Pl.'s Ex. A at 1. Dr. Chi also states that "Dr. Nagda frequently made statements critical of me in evaluations he prepared that were inconsistent with what had actually happened or that were reflective of his personal bias against me." *Id.* at 3. Defendants dispute Dr. Chi's characterization of his experiences at Loyola, contending instead that any conflict arose from Dr. Chi's difficulties with interpersonal communication.

In 2009, Dr. Chi applied for a position at University Medical Center (UMC) in Tucson, Arizona. As part of his application, Dr. Chi signed a "Health Care Provider Authorization and Consent for Release" on July 14, 2009. Defs.' Ex. 61. The consent form contains the following clause:

> I hereby authorize any third parties (past, present, and future) who have knowledge concerning or relevant to my Qualifications or other information provided by me . . . to consult with and release information and records to UMC and [authorized] representatives upon request by UMC.

*Id.* ¶ 4. "Qualifications" is defined in the form as including "any licensure, relevant training and/or experience, competence, judgment, skill, health status, mental or emotional stability, physical condition, behavior, character and ethics." *Id.* ¶ 1.

The form also includes a release clause:

> I release UMC, all Provider Entities, all Third Party Payors, Accrediting Bodies, Organization and Authorities and their respective employees, agents, officers, directors, shareholders, members, medical staffs and the successors thereof from liability resulting from (a) any and all acts performed by them or delegated to others providing, obtaining,

2

> assembling, maintaining and sharing any information as authorized or contemplated hereby, (b) any recommendation any of the foregoing may make to any party concerning my Qualifications, and (c) the release of information as contemplated hereby.

*Id.* ¶ 6. "Provider Entity" is defined as "any entity or organization at or through which I, as an employee, independent contractor, health care provider or otherwise, provide, am authorized to provide, or seek authorization to provide, professional services or which is authorized to bill for professional services provided by me." *Id.* ¶ 5. The consent form stated that it was irrevocable for twenty-four months.

On September 30, 2009, Dr. Nagda signed a completed "Final Graduate Medical Education Training Form" for Dr. Chi in which he stated that Dr. Chi had successfully completed Loyola's residency program and had "demonstrated sufficient professional ability to practice competently and independently" in the field of radiation oncology. Pl.'s Ex. Q. Dr. Nagda further stated, however, that "Dr. Chi has had difficulties in interpersonal communication throughout his residency. While he has improved to a degree which I find acceptable, I am concerned that he may encounter difficulties in the future." *Id.*

UMC sent a fax to Loyola with three separate documents: (1) a form requesting verification of the dates of Dr. Chi's training, (2) an evaluation form, which UMC requested to be completed by the "program/training director who can speak directly to [Dr. Chi's] clinical competence," and (3) the consent form that Dr. Chi had signed in July 2009. Pl.'s Ex. R at 1. Dr. Nagda completed the forms on October 1, 2009 (although he signed the verification form one day earlier). The evaluation form asked Dr. Nagda to rate Dr. Chi's performance on a number of specific areas, as compared to physicians with similar experience. Dr. Nagda did not complete this part of the form but instead

3

wrote in, "Please see attached form," an apparent reference to the September 30 form discussed above. The parties dispute whether Dr. Nagda actually included the September 30 form when he returned the evaluation to UMC. The UMC form also requested an "Overall Evaluation," to be provided by checking off one of the following six boxes:

- I recommend him/her as superior

- I recommend him/her as above average

- Recommend [sic] him/her as qualified & competent

- I recommend him/her, but with some reservation

- I cannot recommend him/her

- A personal phone call would be preferred

*Id.* at 3. Dr. Nagda checked off the box next to the phrase, "I cannot recommend him/her." *Id.*

Dr. Chi testified during his deposition that after Dr. Nagda and Loyola returned the completed form to UMC—effectively "publishing" the statement to them—he experienced significant difficulties in becoming credentialed at the hospital. Specifically, Dr. Chi stated that he was told that because of Dr. Nagda's statement, the credentialing committee "[did] not feel comfortable granting [him] a temporary privilege . . . to start working." Pl.'s Ex. B at 117. Dr. Chi filed suit against defendants in September 2010. At that time, Dr. Chi was still working at UMC. He has since moved to West Virginia, where he is employed by the University of West Virginia Medical Center.

In his response to defendants' motion for summary judgment, Dr. Chi asks the Court to disregard many of the exhibits that defendants submitted in support of their

4

motion.  Dr. Chi argues that the exhibits have not been properly authenticated and that many of them contain inadmissible hearsay.  As discussed below, however, the Court's decision does not rely on any of the exhibits that Dr. Chi has challenged.  The Court therefore denies Dr. Chi's request as moot.

## Discussion

Summary judgment is appropriate when the evidence shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In deciding on a motion for summary judgment, a court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Groesch v. City of Springfield*, 635 F.3d 1020, 1022 (7th Cir. 2011).

The Court previously determined that Arizona law governs Dr. Chi's defamation claim.  *Chi*, 787 F. Supp. 2d at 802.  To be defamatory under Arizona law, "a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation."  *Turner v. Devlin*, 174 Ariz. 201, 203–04, 848 P.2d 286, 288–89 (Ariz. 1993) (citing *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (Ariz. 1989)).

In their briefs, the parties argue four separate issues:  (1) whether the UMC consent / release form accords defendants an absolute privilege against Dr. Chi's defamation claim; (2) what legal standard governs whether Dr. Nagda's statement is considered to be a statement of fact, and whether Dr. Chi has submitted evidence sufficient to meet that standard; (3) the truth or falsity of Dr. Nagda's statement; and (4)

5

whether Dr. Chi has submitted sufficient evidence to permit a reasonable jury to find that Dr. Nagda made the statement with actual malice. Because the Court finds that the UMC form provides defendants with an absolute privilege with regard to Dr. Chi's defamation claim, it does not address the merits of the other three issues.

**1. Waiver of privilege defense**

Dr. Chi contends that defendants did not adequately plead absolute privilege as an affirmative defense and therefore waived this defense. Federal Rule of Civil Procedure 8(c) requires a defendant to plead any affirmative defenses in its answer to the complaint. Fed. R. Civ. P. 8(c). "The purpose of that rule, as courts have long recognized, is to avoid surprise and undue prejudice to the plaintiff by providing [him] notice and the opportunity to demonstrate why the defense should not prevail." *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997).

Rule 15(a) gives a court discretion, however, to allow amendment of an answer to assert an affirmative defense, and a court should do so "freely . . . when justice so requires." Fed. R. Civ. P. 15(a). Courts generally can choose to "recognize a belatedly asserted affirmative defense, so long as the record confirms that the plaintiff had adequate notice of the defense and was not deprived of the opportunity to respond." *Venters*, 123 F.3d at 968; *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 789 (N.D. Ill. 2012) ("[T]he defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond.").

Although defendants' corrected amended answer does not specifically assert "absolute immunity" or "absolute privilege," it generally asserts that "plaintiff's claims are

6

barred by the doctrines of waiver and release." Defs.' Corrected Am. Answer at 13. This is essentially what defendants now argue, though they give their argument a different label.

More importantly, Dr. Chi has made no viable argument that defendants' arguably belated assertion of the affirmative defense unfairly prejudices him in any way. All of the relevant issues implicated by the assertion of the defense have been the subject of extensive discovery by all parties in this case. Dr. Chi has not identified any further discovery that he needs to respond to defendants' argument, and he has had a full and fair opportunity to address the point in his brief opposing summary judgment.

In sum, the Court concludes that defendants did not waive their absolute privilege defense. And even if a viable argument could be made that defendants did so, the Court would allow them to amend their answer at this point to include the defense given the absence of unfair prejudice to Dr. Chi.

**2. Effect of consent / release form**

Defendants argue that Arizona courts generally follow the Restatement (Second) of Torts and that section 583 of the Restatement provides defendants an absolute privilege based on Dr. Chi's consent as embodied in the UMC consent form. Restatement (Second) of Torts § 583 (1977). Dr. Chi contends that Arizona courts would not allow the UMC consent form to afford defendants an absolute privilege. He argues that in Arizona, a consent of this sort is invalidated when a defendant acts with actual malice in defaming the plaintiff.

The existence of a privilege in a defamation case is a question of law to be decided by the court. *Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617,

621 (Ariz. 1984); *Burns v. Davis*, 196 Ariz. 155, 159, 993 P.2d 1119, 1123 (Ariz. Ct. App. 1999). Section 583 of the Restatement provides that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." Restatement § 583. As explained in comment f, this privilege is "absolute" and is "not affected by the ill will or personal hostility of the publisher . . . ." *Id.* cmt. f; *see also* Prosser & Keaton, *The Law of Torts* § 114 (5th ed. 1984) (including a plaintiff's consent as one of the "few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives").

The parties agree that Arizona courts have not addressed whether a defendant is afforded an absolute privilege based on a consent form like the one at issue here. The Arizona Supreme Court has noted, however, that in tort cases, "absent case law to the contrary, [it] usually follows the Restatement." *Keck v. Jackson*, 122 Ariz. 114, 115, 593 P.2d 668, 669 (Ariz. 1979)). The Arizona Court of Appeals, in *Burns v. Davis*, 196 Ariz. 155, 993 P.2d 1119 (Ariz. Ct. App. 1999), applied that directive to a defense of privilege regarding a defamation claim: "To determine if a privilege, absolute or qualified, exists, we first examine the applicable case law. If no clear answer is obtained, then we look to the Restatement for guidance." *Id.* at 159, 993 P.2d at 1123.

The Arizona Court of Appeals has cited section 583 of the Restatement favorably, adopting its view that "[c]onsent is a complete defense to defamation." *Mullenaux v. Graham Cnty.*, 207 Ariz. 1, 7, 82 P.3d 362, 368 (Ariz. Ct. App. 2004); *see also Glaze v. Marcus*, 151 Ariz. 538, 540, 729 P.2d 342, 344 (Ariz. Ct. App. 1986) (citing to comment d of section 583 in finding that plaintiff consented to the publication

of defamatory material). More generally, Arizona courts repeatedly cite the Restatement as authority in the area of defamation law. *See, e.g., Turner v. Devlin*, 174 Ariz. 201, 206, 848 P.2d 286, 291 (1993); *Chamberlain v. Mathis*, 151 Ariz. 551, 554, 729 P.2d 905, 908 (1986); *Green Acres Trust*, 141 Ariz. at 613, 688 P.2d at 621. For these reasons, and because there is no Arizona precedent directly addressing the issue presented, the Court looks to the Restatement for guidance in determining the effect of the consent / release form.

Dr. Chi argues that the Court should find section 583 to be inapplicable in the context of release forms. He contends the Court should instead follow the rule announced by the Florida District Court of Appeal in *Kellums v. Freight Sales Centers, Inc.*, 467 So. 2d 816 (Fla. Dist. Ct. App. 1985): "A party may by an exculpatory clause, absolve itself of liability for negligence, but an attempt to absolve itself for an intentional tort is against public policy." *Id.* at 817 (refusing to apply a prospective employee's signed release to his action against a former employer for defamation). *Kellums* does not, however, make any mention of section 583. And the court in that case appears to have disregarded the employee's express consent, instead relying on an earlier Florida case that established a common-law qualified privilege (as opposed to an absolute privilege) in a case not involving a consent form. *See id.* at 816 (citing *Riggs v. Cain*, 406 So. 2d 1202 (Fla. Dist. Ct. App. 1981). In this regard, *Kellums* conflicts directly with comment f to section 583 of the Restatement, which states that "[t]he privilege conferred by the consent of the person about whom the defamatory matter is published is absolute" and "is not affected by the ill will or personal hostility of the publisher . . . ." Restatement § 583 cmt. f.

9

The Texas Court of Appeals, in *Smith v. Holley*, 827 S.W.2d 433 (Tex. App. 1992), addressed a similar case, decided by a Texas state court, which held that a contractual release that purported to cover a cause of action for gross negligence was unenforceable because it violated public policy. *Id.* at 438 (citing *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574, 576 (Tex. App. 1986)). The court in *Smith* declined to apply that rule to an employee's consent in a defamation case: "[I]t is universally held that in the right circumstances one can consent to certain actions that otherwise would be intentional torts. This is true of defamation, surgical procedures, trespass to land, sporting events that involve physical contact, and a host of other acts that would be tortious in the absence of consent." *Smith*, 827 S.W.2d at 438.

Courts in other jurisdictions have similarly found that the absolute privilege described in section 583 of the Restatement can be premised upon an authorization like the one found in the UMC consent / release form. *See, e.g., Cox v. Nasche*, 70 F.3d 1030, 1031 (9th Cir. 1995) (weight of authority finds that consent / release forms confer absolute privilege upon defendants' defamatory statements that are within the scope of the release); *Eitler v. St. Joseph Reg'l Med. Ctr. S.-Bend Campus, Inc.*, 789 N.E.2d 497, 501 (Ind. Ct. App. 2004) (plaintiff's authorization to former employer to release information and release of former employer from "any and all liability" amounted to consent barring defamation claim); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 508–09, 665 A.2d 297, 316 (Md. Ct. Spec. App. 1995) (applying section 583 to written consent / release forms authorizing disclosure of employment information and "releasing from liability anyone giving prior employment information"); *Patane v. Broadmoor Hotel, Inc.*, 708 P.2d 473, 476 (Colo. App. 1985) (written consent to current

employer gives plaintiff's former employer absolute privilege to discuss work history).

As the Court has noted, the Arizona Supreme Court has instructed courts to look to the Restatement when Arizona case law is unclear, and section 583 of the Restatement clearly contemplates application of an absolute privilege without reference to the "ill will or personal hostility of the publisher . . . ." Restatement § 583 cmt. f. The Court therefore concludes that *Kellums* is not persuasive and will look to section 583 to determine whether the defendants have an absolute privilege that defeats Dr. Chi's defamation claim.

### 3.     Scope of Dr. Chi's consent

In applying section 583, the Court must determine whether defendants' statement was within the topical scope encompassed by the consent / release form and whether Dr. Chi had reason to know that defendants' communications with UMC may be defamatory such that he can reasonably be said to have consented to the defamation. *See id.* cmt. d ("The extent of the privilege is determined by the terms of the consent. These again are to be determined by the language or acts by which it is manifested in the light of surrounding circumstances.").

The UMC consent form authorizes "any third parties (past, present, and future) who have knowledge concerning or relevant to [Dr. Chi's] Qualifications or other information provided by [Dr. Chi] . . . to consult with and release information and records to UMC and its [authorized] representatives upon request by UMC." Defs.' Ex. 61. "Qualifications" encompasses "any licensure, relevant training and/or experience, competence, judgment, skill, health status, mental or emotional stability, physical condition, behavior, character and ethics." *Id.*

Dr. Nagda's statement that he "cannot recommend" Dr. Chi clearly pertains to Dr. Chi's "qualifications," as the consent form defines that term. In the Court's previous decision, it agreed with Dr. Chi that Dr. Nagda's statement "can be reasonably interpreted to constitute an assessment of Dr. Chi's skills as a physician" or "impl[ied] a statement about Dr. Chi's possession of a trait that is important to a physician's competency—namely, strong interpersonal communication skills." *Chi*, 787 F. Supp. 2d at 805–06. Both of these alternative readings of Dr. Nagda's statement fit squarely within the consent / release form's definition of "Qualifications," which Dr. Chi expressly authorized the defendants to discuss with UMC. There is no evidence that the defendants published the statements to anyone but those individuals at UMC covered by the consent form. The Court therefore concludes that the defendants' statement was within the topical scope of the form; there is no genuine factual dispute on this score.

For this reason, the sole question remaining is whether, when Dr. Chi signed the consent / release form, he had reason to know that defendants' communications with UMC might be defamatory. Section 583 does not appear to provide a privilege for defamatory statements that the plaintiff had no reason to anticipate. In particular, comment d advises that "[i]t is not necessary that the [plaintiff] know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication *or that he has reason to know that it may be defamatory*." Restatement § 583 cmt. d (emphasis added).

In his affidavit, Dr. Chi discusses the treatment he received from Dr. Nagda and other Loyola residents and staff. He contends that "[f]rom the beginning of [his] residency at Loyola, [he] was subjected to false statements concerning [his] conduct

12

from other residents, chief residents, program directors, attending physicians, and staff."
Pl.'s Ex. A at 1. Dr. Chi repeatedly refers to Loyola staff "spreading false rumors" and contends that specific doctors "falsely criticize[d]" him beginning as early as 2005. *Id.* More importantly, Dr. Chi states that Dr. Nagda "frequently made statements critical of [Dr. Chi] in evaluations that he prepared that were inconsistent with what had actually happened or that were reflective of his personal bias against [Dr. Chi]." *Id.* at 3.

Taking Dr. Chi's statements as true, they amount to a contention that the defendants repeatedly and consistently made false negative statements about Dr. Chi and his work performance throughout the entirety of his residency at Loyola. Given this history, any reasonable fact finder would conclude that Dr. Chi had reason to know that defendants might make negative and defamatory statements when responding to UMC's request for information.

In *Eitler*, the Indiana Court of Appeals addressed a similar scenario. *Eitler*, 789 N.E.2d at 501. The plaintiff had submitted an affidavit discussing the defendant's "grudge against her" and the "campaign to force [her] to resign or be terminated." *Id.* (internal quotation marks omitted). The court concluded, based on this detailed discussion, that the plaintiff "had reason to know that [the defendant]'s response was going to be negative" and concluded that she possessed the knowledge required to give consent to the defamation. *Id.* In *Smith*, the Texas Court of Appeals arguably went even further, concluding that the plaintiff in that case had sufficient knowledge because "she knew that [the defendant] and others . . . held unfavorable opinions about her performance there." *Smith*, 827 S.W.2d at 440.

The Court finds the analysis in these cases persuasive. Like the plaintiff in *Eitler*,

13

Dr. Chi has provided a sworn statement that establishes that he had good reason to know, when he signed the UMC consent form in July 2009, that the defendants' statements to UMC would likely be negative and defamatory. Thus under section 583 of the Restatement, Dr. Chi's consent "is a complete defense to his action for defamation," irrespective of any malice on the part of the defendants in making the statement. Defendants are entitled to summary judgment on Dr. Chi's defamation claim, his only remaining claim in this case.

**4.      Motion to clarify sanctions ruling**

Dr. Chi previously sought discovery sanctions regarding Loyola's failure to preserve certain backup tapes. The underlying discovery dispute resulted in protracted proceedings before the Court, which the Court need not rehash here. Dr. Chi ultimately sought a default judgment or a spoliation-related adverse inference, as well as attorney's fees for the extra work prompted by the failure to preserve the backup tapes as well as the filing and briefing of the motion for sanctions.

The Court denied Dr. Chi's request for a substantive sanction, concluding that he had failed to show the requisite prejudice regarding his ability to prosecute his case. The Court acknowledged, however, that Dr. Chi had incurred significant expense resulting from Loyola's failure to preserve the backup tapes, and the Court thus kept under advisement Dr. Chi's request to recover attorney's fees. Despite this, the order entered on the docket following the Court's oral ruling simply stated that the Court had denied Dr. Chi's motion for sanctions. Dr. Chi then moved to clarify, seeking to confirm that the fee request was still under advisement. The Court verbally confirmed that this was the case.

14

The Court now grants Dr. Chi's motion to clarify. As the Court ruled, Dr. Chi failed to show the predicate necessary for the substantive sanctions that he sought. But at least of some of Loyola's actions relating to the backup tapes and the discovery requests were unjustified in a way that made it reasonably necessary for Dr. Chi to conduct follow-up discovery. Even though the ultimate result of the follow-up discovery was a dry hole, Dr. Chi is entitled to recover attorney's fees reasonably expended for at least some of it.

The Court therefore grants Dr. Chi's motion to clarify and awards him attorney's fees and expenses reasonably incurred as a result of the failure to preserve the backup tapes and the resulting discovery. The Court wishes to emphasize, however, that this does not constitute *carte blanche* for Dr. Chi's counsel to overreach in preparing a fee petition. The fees properly recoverable are only those directly related to the follow-up discovery that was reasonably necessitated because of, and only because of, the failure to preserve the backup tapes and Loyola's later, erroneous representations regarding the existence of "snapshots." This is likely a relatively modest subset of all the discovery Dr. Chi initiated in this case. In addition, the Court is not awarding fees or expenses relating to Dr. Chi's filing and briefing of the motion for sanctions, because he essentially lost that motion. If Dr. Chi files a fee petition that exceeds the bounds of what is reasonably recoverable, the Court will not hesitate to deny it out of hand.

**Conclusion**

For the reasons stated above, the Court grants defendants' motion for summary judgment [docket no. 181] and directs the Clerk to enter judgment in favor of the defendants. The trial date of April 15, 2013 is vacated. Plaintiff's motion to clarify

15

[docket no. 176] is granted. His fee submission as described in section 4 of this decision is to be filed by February 15, 2013. The case is set for a status hearing on February 21, 2013 at 9:30 a.m., at which time the Court will set the remainder of the attorney's fee briefing schedule.

                                              _____
                                                  MATTHEW F. KENNELLY
                                                  United States District Judge

Date: February 1, 2013